UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: : | Chapter 13 |
|     ROBERT L. WOODARD, : | |
| : | |
| Debtor. : | Bky. No. 01-14036 ELF |
| ──────────────────────── : | |
| : | |
| ROBERT L. WOODARD, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | Adv. No. 13-517 |
| : | |
| CITY OF PHILADELPHIA, : | |
| : | |
| Defendant. : | |
| ──────────────────────── : | |

# **M E M O R A N D U M**

## **I. INTRODUCTION**

Robert L. Woodard ("the Debtor") initiated this adversary proceeding against the City of Philadelphia ("the City") in 2013 after reopening his chapter 13 bankruptcy case – a case which was closed in 2006. The Debtor seeks to claw back from the City more than $36,000.00 the City received from the sale of 1015 South 18th Street, Philadelphia, PA 19146 ("the Property").

The Debtor sold the Property to a third party during the course of his bankruptcy case. The sale was authorized by both the Debtor's confirmed chapter 13 plan and, on the Debtor's motion, a post-confirmation court order. The disputed payment was made in satisfaction of the City's recorded liens against the Property.

The Debtor asserts that the City's acceptance or collection of the disputed funds at the

-1-

sale closing violated the automatic stay, 11 U.S.C. §362, and the terms of his confirmed chapter 13 plan. The City disputes the Debtor's claim.

As set out below, the factual details are somewhat convoluted, but the basis for deciding this case is simple. The post-confirmation order authorizing the sale, entered at the Debtor's request, authorized payment of the amounts the Debtor now seeks to recover. Further, the payment of the City liens was not inconsistent with any provision of the Debtor's confirmed chapter plan. Consequently, I find for the City.

## II. PROCEDURAL HISTORY

On March 20, 2001, the Debtor filed a voluntary chapter 13 case in this court. On April 29, 2003, the court confirmed the Debtor's Amended Chapter 13 Plan ("the Confirmed Plan"). (Ex. P-1A; Bankr. Doc. #46). The Debtor successfully completed the Confirmed Plan and received a chapter 13 discharge on April 19, 2006. (Bankr. Doc. # 132). The case was closed on April 27, 2006.[1]

The Debtor moved to reopen the closed bankruptcy case on August 23, 2013. (Bankr. Doc. # 134). I granted the motion to reopen, and shortly thereafter, the Debtor filed his adversary complaint. On November 11, 2013, the Debtor filed an Amended Complaint. (Adv. Doc. # 6).

---

[1] All of the proceedings in this case prior to February 14, 2006 took place before the Honorable Kevin J. Carey. Judge Carey's involvement in this case terminated on February 14, 2006, when the undersigned was sworn in as a U.S. Bankruptcy Judge for the Eastern District of Pennsylvania.

The City filed its Answer to the Amended Complaint on December 30, 2013. (Adv. Doc. # 9).[2]

Trial was held on June 23, 2014.[3] After the trial's conclusion, I placed the matter in suspense pending settlement discussions. The parties' settlement discussions proved unsuccessful and the adversary proceeding was removed from the suspense docket on September 10, 2014. The parties filed post-trial briefs, the last one being submitted on February 24, 2015.

### III.  FACTS

#### A.  The Proofs of Claim

As of the commencement of his bankruptcy case, the Debtor owned several properties located in the City of Philadelphia. He continues to own most of these properties. (Ex. D-1, ¶5).

Four (4) proofs of claim were filed in the case. One (1) claim was disallowed. Another was stricken as docketed in error. The other two (2) claims were filed by First Union National Bank ("First Union") and the City. (Claims Register, Bky. No. 01-14036). Both claims were for

---

[2] In the Amended Complaint, the Debtor asserted, and in its Answer, the City agreed, that this is a core matter in which the bankruptcy court may enter a final judgment. See 28 U.S.C. §157(b)(2)(A), (N), (O).

[3] The trial was facilitated by a fact stipulation (Ex. D-1) prepared by the parties' counsel. The fact stipulation has various documents attached to it as exhibits. At trial, three (3) witnesses testified: the Debtor, Matthew Burden (a "tax analyst" for the City Department of Revenue) and Cheryl Grandy
(a "receivables supervisor" in the City Department of Revenue). The parties also offered additional exhibits into evidence.

Many of the exhibits are documents that were filed in connection with the Debtor's main bankruptcy case. Some of those documents were filed before the activation of the court's electronic filing system. Where the documents are currently available on the court's electronic docket, I will cite to the court docket. Otherwise, I will cite to the exhibit notations used for the hard copy documents offered into evidence at trial.

delinquent real estate taxes on multiple properties.[4]

First Union, as Trustee for certain bondholders, filed a secured claim in the amount of $41,159.73 on May 23, 2001. (Id.). After the Debtor objected to the claim, the court entered an Agreed Order allowing First Union's claim, but in a reduced amount: $27,802.84. (Ex. D-1 ¶ 9). The Agreed Order delineated the allowed amount of First Union's claim with respect to each of the Debtor's properties. With respect to the Property, the allowed amount was $4,204.20.[5] (Ex. B to Ex. D-1; Order dated July 19, 2005, Bankr. Doc. # 119).

On July 9, 2001, the City filed a secured claim in the amount of $5,764.62. (Ex. D-1 ¶ 7). With respect to the Property, the allowed amount was $1,134.86. (Order dated July 19, 2005, Bankr. Doc. # 119). The City's claim was based on taxes assessed in years following the unpaid taxes listed in First Union's claim. (See Ex. D-1, ¶¶6-7).

### B. The Plan and the Sale

The Confirmed Plan provided for the Debtor to make monthly payments to the Chapter 13 Trustee of $250.00 per month for nearly the entire duration of the plan. The Confirmed Plan

---

[4] The parties did not offer the proofs of claim into the record and they are not easily accessible because they were filed before the electronic filing era. However, I infer from other evidence in the record that each claim was an "aggregate" claim for taxes, i.e., a single claim for delinquent real estate taxes on multiple properties owned by the Debtor. (See Order dated March 18, 2003, Ex. B to Ex. D-1 (allocating the amount of the allowed claim among multiple properties); Order dated July 19, 2005, Bankr. Doc. # 119 (reducing both proofs of claim by only a part of the proceeds of the sale of the Property)).

[5] It appears that the First Union claim was based on unpaid taxes accruing through 1996. (See Order dated March 18, 2003, Ex. B to Ex. D-1).

also provided, inter alia, that:

- the Debtor would sell the Property to pay the secured claims for real estate taxes and water and sewer liens held by First Union and the City; and

- the property of the estate shall revest in the Debtor upon confirmation and that the Debtor shall have the sole right to use and possess said property.

(Confirmed Plan ¶¶ 3, 7; Ex. P-1A).

On or about June 6, 2005, the Debtor signed an Agreement of Sale to sell the Property for $100,000.00. The sale price exceeded the amount of the claims filed by First Union and the City attributable to the Property. (Ex. D-1, ¶ 11).

On June 8, 2005, the Debtor filed a motion seeking bankruptcy court approval of the sale of the Property ("the Sale Motion"). (Bankr. Doc. # 114). The court granted the Debtor's motion and approved the sale by order dated July 19, 2005 ("the Sale Order"). (Bankr. Doc. # 119).

The "Sale Order" provided, inter alia, that:

> [T]he Debtor is granted permission to sell [the Property] . . ., free and clear of all liens, pursuant to the terms of the Agreement of Sale . . . **with the proceeds to be distributed to all taxes and other unavoidable liens of taxing authorities** against the Property, **and any additional settlement costs chargeable to the Debtor, with any remainder payable to the trustee**. The proceeds of the sale shall be retained by the trustee into an account to be paid to filed and allowed claims and his commissions, and the balances shall be paid to the Debtor.

(Ex. B, attached to Ex. D-1) (emphasis added).

Settlement on the sale of the Property occurred on October 21, 2005. A copy of the settlement statement (HUD-1) prepared by the title clerk, First American Title Insurance Company, was provided to neither the Debtor nor the City prior to settlement. (See D-1, ¶ 14).

Shortly after the settlement date, on October 25, 2005, the title clerk delivered the seven

(7) checks to the City in the aggregate amount of $40,756.79 for the following City claims:

    1. $3,118.36 - Real Estate Taxes for the Property

    2. $20,007.43 - Common Pleas Judgment 89-05-00318

    3. $1,079.00 - Municipal Court Judgment CE-04-07-73-0059

    4. $13,460.95 - license and inspection liens ("L&I liens")

    5. $2,539.05 - Municipal Court Judgment CE-94-08-32-06160

    6. $498.00 - Fines and Fees

    7. $54.00 - Use & Occupancy Taxes

(Ex. D-1, ¶¶ 16-17).

The Settlement Statement indicated that the Chapter 13 Trustee received net proceeds of $56,690.01. (See Ex. C, attached to Ex. D-1). From this amount, the Trustee distributed approximately $30,000.00 to the Debtor. (N.T. at 43; 89 and 90). The Debtor apparently expected to receive "a lot more" than the $30,000.00 from the Trustee as a result of the sale of the Property. (N.T. at 89). Despite this, the Debtor did not contest the amount of the sales proceeds that he received. (N.T. at 90).

### III. DISCUSSION

The Debtor disputes the propriety of the following distributions made to the City from proceeds of the sale of the Property in October 2005:[6]

---

[6] There is no dispute regarding the $3,118.36 check which satisfied the Real Estate Taxes for the Property. There also is no issue regarding two (2) checks issued to the City: $498.00 (fines and fees) and $54.00 (Use & Occupancy Taxes) because those payments were attributable to the School

1. $20,007.43 – based on the Common Pleas Judgment, No. 89-05-00318

2. $1,079.00 – based on the Municipal Court Judgment, CE-04-07-73-0059

3. $13,460.95 – based on L&I liens

4. $2,539.05 – based on the Municipal Court Judgment, CE 94-08-32-06160.

The Debtor asserts that the City's acceptance of these payments violated several subsections of the automatic stay, as well as the terms of the Confirmed Plan.[7]

### A. Claim for Violation of the Automatic Stay

The Debtor first contends that the City's acceptance of the settlement checks and use of such proceeds toward the four (4) judgments/liens violated several sections of 11 U.S.C §362(a)

---

District of Philadelphia, who is not a party to this proceeding.

[7]  The Debtor also disputes the validity of the municipal claims themselves, i.e., he asserts that he did not owe the money. This argument appears to be two-fold. First, he asserts that he regularly visited the City's Municipal Services Building, but was never informed that he had any outstanding municipal claims. (N.T. at 32-33, 150). Second, with respect to the judgments, which he asserts were for unpaid business taxes, he argues that he cured any outstanding balances when he filed amended returns for Business Use & Occupancy Tax. (See Exs. P-3 - P-35; N.T. at 50, 150; Debtor's Br. at 6 (unpaginated)).

I am unpersuaded by the Debtor's challenge to the validity of the City liens. The first argument lacks any legal foundation or authority and requires no discussion. As for the second argument, the Debtor's unfocused testimony and supporting documents did not establish a convincing relationship between prior judgments and the later amended returns. Therefore, he did not meet his burden of proving that the judgments for unpaid taxes were later resolved by his amended tax returns.

Therefore, my analysis in the remainder of this Memorandum is limited to the Debtor's claims for violation of the automatic stay and the Confirmed Plan.

– (1), (2), (3), (4), (5) and (6).[8] The Debtor points out, correctly, that the Confirmed Plan provided that the Property revested in the Debtor upon confirmation and that the automatic stay remained "in full force and effect" until the case was closed. (Ex. P-1A at ¶¶7, 9). Accordingly, the automatic stay was in effect (as to the Property and its proceeds) at the time of the settlement and when the checks were dispersed to the City.

Evaluating whether a §362(a) violation occurred in this case would require consideration of several variables and issues: Which subsections apply to enforcement of claims against the Debtor or property of the Debtor (as opposed to property of the estate)?  Were the City claims paid from the Property sale proceeds prepetition or postpetition claims?  Did the City passively accept payment or did it take overt action to collect its claim?  Is passive acceptance of payment

---

[8] The Debtor invokes several subsections of 11 U.S.C. §362(a), which provide that the filing of a petition operates as a stay of, inter alia,

- the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case . . . or to recover a claim against the debtor that arose before the commencement of the case, see §362 (a)(1);

- the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case, see §362 (a)(2);

- any act to obtain possession of property of the estate or to exercise control over property of the estate, see §362 (a)(3);

- any act to create, perfect, or enforce any lien against property of the estate, see §362 (a)(4);

- any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case, §362 (a)(5);

- any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case, see §362 (a)(6).

sufficient to violate the automatic stay?

It is unnecessary, however, to parse each subsection of §362(a) and consider these issues. Even if a stay violation occurred, the Sale Order controls the outcome.

The Sale Order, which was granted on the Debtor's motion and entered post-confirmation in accordance with the Confirmed Plan, provided that the "proceeds should be distributed to all taxes and other unavoidable liens of taxing authorities." All of the payments received were on account of unavoided (and presumably unavoidable) liens held by the City, a taxing authority and thus, were authorized by the Sale Order.

I conclude that, although the Sale Order did not expressly grant relief from the automatic stay to permit the City to collect its secured claims that were not included in its proof of claim, the Sale Order effectively operated as an order granting limited relief from the automatic stay. See 11 U.S.C. §362(d). There is simply no other way to look at it. I cannot interpret the Sale Order as authorizing the payment of specified claims secured by liens and then hold the recipient of those payments in contempt for violation of the automatic stay, because it accepted the very payments authorized by the Sale Order. That would be absurd. The Sale Order implicitly and necessarily modified the automatic stay. Thus, the City's acceptance of the settlement proceeds on account of its unavoided liens, authorized by the Sale Order, was proper.

**B. Claim for Enforcement of the Confirmed Plan**

The Debtor also argues that the City's actions violated the Confirmed Plan because the City's distribution should have been limited to the amount of the allowed proof of claim attributable to the Property. Therefore, according to the Debtor, the distributions were improper.

The Debtor's argument emanates from the fact that the City did not include those other liens and judgments listed on the HUD-1 in its proof of claim. In other words, the City did not file what one might describe as a "comprehensive" proof of claim for all of its claims that were secured by the Property. Its proof of claim was limited to real estate taxes. The Debtor suggests that a creditor should not be entitled to "pick and choose" which claims are included in a proof of claim, and as a result, the City should disgorge the money it received on account of the liens and judgments not included in its proof of claim.

Respectfully, I disagree.

### 1.

A secured creditor is not required to file a claim and failure to do so does not divest the creditor of its lien. In re Mansaray-Ruffin, 530 F.3d. 230, 235 n.4 (3d Cir. 2008). If a creditor does not participate in the bankruptcy process, and does not file a proof of claim, its lien passes through the bankruptcy unaffected. Estate of Lellock v. Prudential Insurance Co. of America, 811 F.2d 186, 189 (3d Cir. 1987); In re Olick, 517 B.R. 549, 562 (Bankr. E.D. Pa. 2014). Stated slightly differently, if a lien is not addressed and treated in some fashion during the course of a bankruptcy case — either by being provided for in a reorganization plan, avoided pursuant to a Code avoidance power, disallowed in whole or in part — it passes through the bankruptcy case unaffected. See In re Thomas, 497 B.R. 188, 205 (Bankr. E.D. Pa. 2013).

Thus, a secured creditor might decide that participation in the bankruptcy process is not in its best interest and therefore, make a conscious choice not to seek a distribution from the estate, instead relying on its collateral to provide for satisfaction of the underlying debt at some point in

the future. Such a creditor exercises this choice by not filing a proof of claim. If the creditor does not file a proof of claim, the case law is clear that its lien passes through. If the debtor finds that prospect unsatisfactory, it is incumbent on the debtor to take some action to compel the creditor's participation in the chapter 13 rehabilitation plan. A chapter 13 debtor has ample tools to do so by: filing a claim on the creditors's behalf, see Fed. R. Bankr. P. 3004; expressly providing for the creditor's claim in a plan that binds the creditor to its terms, see 11 U.S.C. §1327(a); or instituting a contested matter or adversary proceeding to challenge the validity of or otherwise alter the status of the creditor's secured claim, see 11 U.S.C. §506(a); Fed. R. Bankr. P. 3012, 7001(2).

On the other hand, if a secured creditor files a proof of claim or the debtor provides for the creditor's claim in the plan, §1325(a)(5) sets forth criteria for treatment of secured claims in chapter 13 plans. Then, upon confirmation of a chapter 13 bankruptcy plan, both the debtor and the creditors are bound by its terms, 11 U.S.C. §1327(a), In re Szostek, 866 F.2d 1405, 1408 (3d Cir. 1989), and plan confirmation also has res judicata effect, In re Michael, 436 B.R. 323, 329 (Bankr. M.D. Pa. 2010) (citing Szostek, 866 F.2d 1405).

**2.**

Reduced to its core, the Debtor contends that a proof of claim filed by a creditor who holds multiple, independent claims secured by a bankruptcy debtor's property must include all of its claims in the proof of claim. Implicit in the argument is the notion that a creditor who fails to include all of its secured claims in its proof of claim (or who fails to file multiple proofs of claim for all of the separate claims) effectively waives its rights with respect to the unfiled claims,

-11-

presumably based on provisions of the debtor's confirmed plan that bind the creditor to accept payment on its filed claim in full satisfaction of all of its secured claims. See Thomas, 497 B.R. at 204-05 (stating a hypothetical where this might occur).

The Debtor's argument here fails for at least two (2) independent reasons.

First, the Debtor has cited no legal authority that suggests that a creditor must file a proof of claim (or multiple claims) for all of its claims secured by a particular property that is property of bankruptcy estate. Nor do I find any compelling policy reason for judicially engrafting such a requirement on to the statute. As stated above, a chapter 13 debtor has ample tools "to bring a secured creditor into a bankruptcy case" and bind the creditor to the terms of a confirmed chapter 13 plan. And, to the extent the Debtor's argument is based on the notion that it is unfair to allow the creditor to "hold back" on filing a "comprehensive" secured claim because a debtor may be unaware of the some of the distinct debts secured by the lien, I am not sympathetic. A simple title search prior to the filing of the case or even confirmation of the plan would permit a debtor to ascertain the existence of unfiled, secured claims and, once known, such claims can be addressed in the plan confirmation process. Indeed, in this case, a title search might have avoided the whole problem presented in this adversary proceeding.[9]

Second, and equally compelling, the Confirmed Plan, on its face, did not contain language that purported to bind the City to accept payment of its filed claim in full satisfaction of all claims secured by the Property it might hold. Paragraph 4.B. of the Confirmed Plan defines

---

[9] It also is difficult to work up a great deal of sympathy for the Debtor considering that it took almost eight (8) years for the Debtor to "wake up" and complain about being shortchanged at the sale closing.

Class 2 as only "secured claims for real estate taxes and water and sewer lines held by [the City]." The Confirmed Plan did not classify or provide in any way for **non-real estate taxes or other municipal claims** that were secured by the Property, such as the City's disputed secured claims at issue in this adversary proceeding. Thus, based on the established legal principles discussed above, the City's secured claims that were paid at the closing to the Debtor's eventual chagrin were not provided for in the Debtor's plan. Claims "not provided for" in a chapter 13 plan are not discharged and effectively "pass through" the bankruptcy case. See In re Waldman, 75 B.R. 1005, 1008 (Bankr. E.D. Pa. 1987); see also 11 U.S.C. §1328 (discharge applies only to claims "provided for by the plan"). Consequently, the City's secured claims paid at closing were unaffected by the Debtor's bankruptcy filing (except by the automatic stay, so long as the stay remained in effect). Thus, while the payment at closing potentially could have violated the automatic stay (although it did not, due to the Sale Order), the payment could not have been prohibited by or violated the Confirmed Plan. This case is on all fours with my prior decision in Thomas and I adhere to my discussion of the issue in that opinion. See 497 B.R. at 203-05.

In this case, the "pass-through" status of the City's unfiled secured claims changed only because the Debtor sold the Property and provided for their payment in the Sale Order, an order that the Debtor submitted to the court and that the court entered. Thus, the Sale Order and the payment to the City were not inconsistent with the Confirmed Plan; the use of the sale proceeds to pay liens that were not provided for in the Confirmed Plan in the court-authorized sale of the Property and did not violate, but merely supplemented, the Confirmed Plan.

In the absence of any violation of the terms of the Confirmed Plan, there is no basis to grant the Debtor any relief.

## IV. CONCLUSION

For the reasons set forth above, I will enter judgment in favor of the City of Philadelphia.

An appropriate order follows.

Date: June 18, 2015

ERIC L. FRANK
CHIEF U.S. BANKRUPTCY JUDGE